This is a case in which the Department of Energy has awarded a million dollars of crude oil refund on the basis not of substantial evidence, which is what this court has said is required, but on the basis of what I think is an assumption based on another assumption. And that does not meet the required standard. Why isn't it a reasonable estimate in this case to use the national average for refining crude oil? Because the issue here is there are facilities which are refiners which produce polymer grade propylene. There are steam cracking units which produce it. There are also other units, the units relevant in this case, where there is both a refiner and a steam cracking unit in the same installation. In this case, the purchases, the critical purchases were from six of those R&SC, that is combined refiner and steam cracking units. The issue, of course, is if the propylene comes from the steam cracking unit, then it does not qualify for refunds. Everybody agrees to that. If it comes from a refiner unit, it does qualify for refunds. Everybody agrees to that. There is no evidence, none, that OHA had about what the situation is of refiner and steam cracking combined units, that is how much comes from each. As a matter of fact, in this case, finally at the prodding of Consolidated Edison, I think they did send a letter inquiring as all these R&SC units as to what percentage was in fact refiner and what percentage steam cracking. They found out, got responses from two, only three of them. In two responses they got, they said, oh, by the way, one said, although this is listed as refiner and steam cracking, it is actually all steam cracking, zero came from the refiner side. In the second one, again, where it was refiner and steam cracking, the response was only 25% came from the refiner unit, and there is even question about whether they qualify. The OHA has a problem here. This is getting close to four decades now since the records have been accurate, and they have to somehow bring this whole thing to a close, and why not reasonably use the national average? Because what you are nationally averaging is not R&SC units, what you are taking is six separate refiner units, seven separate steam cracking units, and you are making an average. That tells you nothing about what is true of an R&SC unit, absolutely nothing. It just doesn't. In fact, the only two they have any information about are inconsistent with the assumption. The assumption is it's 37%, the information is it was zero in one case and 25 in another. So the actual information about relevant units from which this company bought is that the assumption that they make is inconsistent with the actual evidence. So there were six R&SC units originally, right? Yes, that they purchased from. Two of them, I guess they were able to make determinations? Correct. And are those the two that you are referring to? Correct. Okay. One was zero out of 1,545 million pounds, zero was refining, and the other out of 50 million pounds, 25% was reported to be refining. So those two weren't an issue in that way? No, they are out. Those aren't an issue? We're down to four. They're out. We're down to four. They're down to four. And in the four, that's right. The only reason I cite the two is because the only information one has is as to those two. And they're not only R&SC units as opposed to separate refiner and seam cracker units, but they're also units from which this company bought. So, you know, the normal assumption is that… I assume there's no information with respect to any of the four, right? There was a Shell facility, an Exxon Mobil facility, what was it? Cities, yeah. The three critical ones, actually, are what was a cities facility. That really is 73% of this claim. And there's an Exxon Mobil. There's a Mobil at Beaumont, Texas, and there's a Gulf at Fort Arthur, Texas. And what about the fourth one? Why is that not… Is that just a minimum? If the purchases were so small, it's not worth worrying about. I mean, the purchases are, I think, the total purchases are 18 or something. It's irrelevant. It's not that those figures can be determined. It's just that in your view and everybody's view, they're de minimis. Yes. We just didn't bother with them because it doesn't matter. Mr. Klaudner, here's my problem. You're really asking us to redo what the OHA has done. You're asking us to look at this and somehow conclude that their estimate wasn't reasonable, but they're the people who know these estimates better than anyone. How can you expect us to just on kind of your word decide that their estimates aren't reasonable? They're the people in charge. The requirement here is not… The requirement here is there is a burden of proof which DOE has said applies to an applicant. And the burden of proof is to provide substantial evidence. That's the rule. And this court has said what substantial evidence has endorsed the Temporary Emergency Court of Appeals. Substantial evidence is evidence which a reasonable mind would accept as adequate to support a conclusion. Now, taking 13 units which are unrelated, 6 steam cracking, 7 refiner, and saying that if we average those, we'll figure out what happens in 4 RNSC units when our actual information is as to the only ones we know anything about, 2 others, that is inconsistent… But the OHA tells us that's their best estimate and that it's supported by substantial evidence. How are we going to evaluate on your word alone that they're wrong? It's not my word. The question is would a reasonable mind looking at those, the information they had, come to the conclusion that they came to? That's the issue. The issue is this court sits with de novo review as to whether or not substantial evidence test has been met. It's de novo review just as the district court was and this court has de novo review with no deference to the district court. And the issue here is if they've given you no basis, no basis for believing that the… I said it was based on 2 assumptions and assumption 1 is that the RNSC units' capacity to produce propylene is the same as the ratio of separate units is. No basis for that is suggested, it's just what they say. You would be here arguing today, I mean one of the arguments you make is that these 2 RNC units, combined units, with respect to which they do have figures, in essence impeach the approach that was used by OHA, correct? They do. Would you still be here if you didn't have those 2? Assume for the moment that there wasn't anything in the record along the lines that you pointed to with those 2 refineries that were combined. You still would have a problem, you're saying, with respect to the methodology that was used? Let me ask you this, if you had been OHA, what would you have done? I would have said to the company, we told you. The company being Hercules? I would have said to Hercules. I'm sorry, Hercules? Yeah. If I've been Hercules? No, if you've been OHA, you would have said to Hercules. I would have said to Hercules, you've either got to get information, which you can get, because in fact they did find a guy who, can't rely on because they didn't back those estimates, but they did find a guy who said he could make an estimate. There's no reason why you couldn't find somebody, and if they couldn't find anybody, then they've just failed their burden. But the answer is, what they had to do was what this court has endorsed in Goodyear, what OHA endorsed in Firestone, what they had to do was go out and find somebody who knew something about those facilities and could say to them, I was there in the 70s, and in fact, the capacity situation visibly R&SC in the city's unit was so and so. That's what they had to do. They finally, under my prodding, after I got into the case, did go out, but they sent one simple letter, they got a response, very minor responses, and they dropped it. The answer is, they didn't do what was required to be done. You say after you got into the case, you're right, you're prominently featured in the OHA opinion. Yes, well, what OHA did remember is they put out, in this case, I thanked them for it. Instead of putting out a final order, which I've been up from before, they put out a proposed order and sent me a copy of the proposed order specifically in addition to the Federal Register notice and said, you know, if you want to participate, you can. That's when I got into the case. There was an invitation, and they were an invitation to consolidate it, and it was picked up. Just to finish the second assumption thing. Even assuming that you could take the separate units and average them and figure out what the capacity allocation is of 450 million pounds in cities between the R unit and the SC unit, you have a second problem. The second assumption is that the actual production at those combined units would mirror the capacity, because that's what they did here. Now, there's no basis. Nobody suggests any basis for that. As long as you're into your rebuttal time, you want to… Just to finish that sentence. That issue doesn't exist for separate units. A separate unit has capacity. It actually is going to produce from that capacity. But when you have a combined unit, let's assume you, 37% of it is 450 million pounds was in fact refiner base. Let's assume that. Even assuming that, if you're producing from those two, there's no information about whether you're producing, actually producing from the refiner or producing from the steam cracking. And only what you're producing is relevant to the issue of what they bought. Obviously, you didn't produce it. They didn't buy it. Appreciate it, Your Honor. Thank you. Mr. Kemp? Good morning, Your Honor. This is yet another plaintiff's effort to derail the refund program. We're almost at the end of it. What do you mean almost? I've heard that before. I understand that. I appreciate your situation. I think there are… It's been four decades. There's one case on appeal. One other case on appeal. And I think there's one in the district court. I don't know if there's another one or not. Claude would know better than I about what cases he intends to bring. But we hope it's near the end. We've put out a Federal Register notice dispersing funds which have not been committed or have been challenged thus far. We're reserving those funds which are at issue. Hopefully, as these cases are resolved, we'll be able to distribute those funds. I realize, and it is 40 years. I've been doing this about that long. Your question to Mr. Klaudner about what would you do if you were OHA is very apropos because Mr. Klaudner has been trying to run the agency and run the distribution process for many years through his advocacy. But OHA did pose these inquiries to Hercules and tried to ascertain the best information they could. Hercules submitted an affidavit, Mr. Crowett, I believe. And his opinion was that that information was no longer available. But they did submit these statistics from the Chemical Industrial Management Association volume reflecting the production of the appropriate propylene. Let me ask you, one of the arguments that Mr. Klaudner makes, it's one of the arguments. He says, look, you have two combined facilities. And the figures that we know that are established from those facilities are vastly different from the figures developed based on the estimates of refineries and cracking facilities that were used in the methodology. In other words, he says these two facilities that were combined impeach the validity, if you will, of the methodology that OHA used. What is your response to his contention with respect to those two combined facilities? Well, it is shown that Hercules used a certain volume of propylene. And that's the volumes they've claimed for. And as a matter of fact, they initially claimed for 50 percent of the gross volume. And OHA said, no, we can't buy that. And then they submitted 48 percent that they thought that was appropriate. And OHA said, no, that's no good. And finally, they came up with these CIMA statistics that said this is on a national basis. This is the percentage of propylene which is generated. But, Mr. Kent, I think Judge Schall's question is, why are those national statistics appropriate and reasonable, given the fact that for the two facilities where there's combined refining and steam cracking capability, where there is information, the data is quite different from what the national average shows? Because we don't know anything about either the two or the four RNSC units. We don't know what the two that were reported, that had reports, were used for. Or we don't know, we definitely don't know what the four that are unreported. No, but Mr. Kalander is only talking about the two. And we do seem to have figures for those. Why does he not have? Well, first of all, one of the reported RNSC things was not an RNSC. It was just a steam cracking unit. So they didn't get anything from that. But what is your best answer, Mr. Kent, to his reliance on those two facilities, where we get different figures from what the national figures are based on the methodology that the department used? As to the four units in question?  Why we shouldn't apply that? Because OHA made the judgment that they were not relevant to the overall picture. No, but the question is why. Why did they make that judgment? I think they are not relevant because those facilities may have had a different character than the regular RNSC facilities. Well, is this in the record, or is this just your speculation? I must confess that it is my speculation. You know, OHA said, you know, these two are out of the picture. We're not going to consider that. And we're only going to consider the four facilities which are in question. And then they ran their percentage against those facilities. So I don't have a good answer for you. I'm upset. There may be a good answer. I don't have it right now. I apologize for that. And the agency, under the applicable standards, the agency tried to get more definite information. They did not get more information. The best information they could get were the CIMA statistics. And those are the ones upon which they relied and applied the longstanding agency expertise. You're right. It's been 30 or 40 years, but OHA has built up a lot of expertise over that period of time. And they applied that to those statistics and identified the 37% as the appropriate number. The Court has no other questions. Thank you, Mr. Kent. Mr. Quadner, you have? Just briefly, if the Court pleases, this question that I've been asked about what should they have done is actually something they did do. When after—and Mr. Kepp correctly says the first thing they suggested is when an RNSC facility, why don't you—the company suggests Hercules, use 50-50. Assume 50% was R and 50% steam bragging. And OHA responded to that, said that's not good. That's not good enough. You have to provide further probative evidence. And they said the kinds of things we're talking about are in past cases, affidavits from individuals familiar with the operations involved have been found to constitute such persuasive information. So they had a roadmap. They were told exactly what to do. In fact, there was—they had consulted with somebody in the industry, a guy named Zinger, earlier in 1997. Late in the game, OHA asked Zinger itself whether he had an idea. He said, well, I could make an estimate in the 80s and probably I could make an estimate in the 70s if I was given the time to do it. And they then wrote to Hercules as well as to Consolidated Edison and said, do you want to support Zinger? And Hercules didn't suggest any support for Zinger in making an estimate. The only inference from that that you can get is they didn't believe that estimate would be very helpful to them if he was subject to having to establish how he made the estimate, etc. So the information was available theoretically. But in any event, the burden was on the applicant. It was set forth in the 92 proceeding that it was on the applicant. And in this specific case, OHA said, you have to show something. And what you're going to give us is affidavits of people who know something about it. They didn't do it. And absent that, what you have is a failure to carry the appropriate burden of proof and a failure of substantial evidence because, as I think correctly pointed out, the only evidence they have, in fact, impeaches the estimates on the basis of which they used. The court has no further questions. Thank you, Mr. Kaladner. Our final case today is DSU Medical Corporation.